IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SAMUEL QUINN, | ) |
| Plaintiff, | ) ) ) |
| | ) 11-cv-1173 |
| v. | ) ) Hon. John Z. Lee |
| MARCUS HARDY, et al., | ) ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Defendants Dr. Partha Ghosh ("Dr. Ghosh") and Wexford Health Sources, Inc. ("Wexford") (collectively, "Defendants") move for summary judgment on Plaintiff Samuel Quinn's ("Quinn") claims brought under 42 U.S.C. § 1983 for violations of the Eighth Amendment. Quinn, a prisoner, suffers from various medical conditions, including foot and back pain. Quinn alleges Dr. Ghosh and Wexford violated his Eighth Amendment rights while managing and treating Quinn's medical needs at Stateville Correctional Center. Defendants argue that Quinn marshals no evidence creating a genuine issue of material fact that Dr. Ghosh acted with deliberate indifference in treating Quinn's foot and back pain. Defendants also argue that Quinn identifies no policy or practice sufficient to make Wexford liable under 42 U.S.C. § 1983. For the reasons provided herein, Defendants' motion for summary judgment is granted in part and denied in part.

**I. Factual Background[1]**

**A.    The Parties**

Quinn is a fifty-three-year-old inmate serving a life sentence in the Illinois Department of Corrections ("IDOC"). *See* Defs.' LR 56.1(a)(3) Stmt. ¶ 1; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 32.

---

[1]    The following facts are undisputed unless otherwise noted.

1

The IDOC transferred Quinn to Stateville Correctional Center ("Stateville") sometime in 2007. *See* Defs.' LR 56.1(a)(3) Stmt. ¶ 1. Stateville houses a generally older population of between 1,500 and 1,700 inmates and also acts as a referral center for sick inmates from other institutions being transferred for offsite medical treatment. *Id.* ¶ 5.

Dr. Ghosh acted as Medical Director at Stateville from June 2003 until his retirement in March 2011. *Id.* ¶ 2. In this capacity, Dr. Ghosh provided medical care to inmates. *Id.* In particular, Dr. Ghosh was responsible for making infirmary rounds, reviewing patients sent for offsite treatment, covering patient clinics for HIV and Hepatitis C, attending to patients on his sick call list (a list of more complicated patients going offsite for treatment), and covering emergency calls in urgent cases. *Id.* ¶¶ 2–3. Infirmary rounds occupied approximately half of Dr. Ghosh's day, and Dr. Ghosh typically treated almost forty patients a day. *Id.* In addition to these clinical duties, Dr. Ghosh also had administrative responsibilities, which included attending quality assurance meetings and offsite meetings in Springfield, Illinois, consulting with the State agency medical director, and handling administration of mental health care at Stateville. *Id.* ¶ 4. Dr. Ghosh, like other medical personnel at Stateville, was employed by Wexford, a private company that provided medical services to the IDOC under contract. *Id.* ¶ 6.

B. **Quinn's Prior Medical History**

Even prior to his incarceration, Quinn had a history of medical issues: nerve damage to his face from a previous gunshot wound; nerve damage to his foot from a pre-existing fibrotic tumor; degeneration of a disc in his lower back; and migraine headaches. *See* Defs.' LR 56.1(a)(3) Stmt. ¶ 12. The benign fibrotic tumor was removed from Quinn's foot prior to incarceration. *Id.* ¶ 13. Quinn had residual nerve damage and pain after the procedure. *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 13. Quinn also suffered bad falls sometime in 1985 or 1986 and 1997

or 1998. *See* Defs.' LR 56.1(a)(3) Stmt. ¶ 14. Because of these falls, Quinn had to use a cane. *Id.* Stateville does not permit canes, and the prison issued crutches to Quinn upon his arrival. *Id.*

Because Quinn suffered from significant foot pain, Dr. Ghosh issued Quinn a year-long permit for orthopedic shoes upon his transfer to Stateville, and the Stateville medical staff ordered them for him. *Id.* ¶ 15. Quinn also had a pair of medical shoes from his time at Cook County Jail, but Stateville took these away from Quinn upon his entry because they were different from the type of shoes Stateville normally gave to inmates. *Id.* Quinn received the initial pair of orthopedic shoes prescribed by Dr. Ghosh, but after a little over a year they were torn up and went missing. *Id.*

After the first pair of shoes were destroyed, Dr. Ghosh issued Quinn a one-year medical permit on January 28, 2010, for a pair of special shoes. *Id.* ¶ 27. The prescription for the shoes was filled by a different doctor at Stateville on June 22, 2010. *Id.* Quinn, however, continued to suffer from pain in his left foot, which he describes as "aching." *Id.* ¶ 16. Quinn currently has a special shoe (what he refers to as a "surgical shoe") that supports the arch in his left foot, though he complains that the shoe is meant to be a temporary measure until he receives the orthopedic shoes that were prescribed. *Id.*; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 16. Quinn also states that the shoe does little to alleviate his pain. *Id.*[2]

### C. Appointments with Dr. Ghosh

Quinn made several appointments to see Dr. Ghosh through the Stateville medical appointments request system. At Stateville, inmates request an appointment by sending a form

---

[2] The parties dispute who was responsible for ordering the orthopedic shoes. Defendants argue that Wexford ordered Quinn's shoes and that a clothing supervisor, who is not a Wexford employee, was responsible for providing the shoes to Quinn. *See* Defs.' LR 56.1(a)(3) Stmt. ¶ 17. Quinn denies this, and argues that the evidence cited by Defendants merely shows that the Stateville staff told Quinn different things regarding who was responsible for actually providing the shoes. *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 17. Quinn believes he received no clear answer to this question. *Id.*

to the healthcare unit.  *Defs.' LR 56.1(a)(3) Stmt.* ¶ 24.  A healthcare technician then reviews the form and immediately schedules the inmate to see a provider.  *Id.*  This provider usually was La Tanya Williams, an independently licensed physician assistant who was qualified to make her own recommendations for patients.  *Id.* ¶¶ 24–25.  The IDOC maintained this appointment procedure for inmate requests.  *Id.* ¶ 25.

Dr. Ghosh, as Medical Director, often saw patients, who were referred to him by other physicians and physician assistants.  *Id.* ¶ 26.  Dr. Ghosh also saw inmates that posed treatment problems for other doctors.  *Id.*

Quinn did not show up for his first formal appointment with Dr. Ghosh, scheduled for October 21, 2010.  *Id.* ¶ 28.  Quinn had attempted to commit suicide days before the appointment, and Dr. Ghosh knew that Quinn was on suicide watch at the time.  *See* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 29.  Dr. Ghosh, however, was not in charge of rescheduling the appointment, and no make-up appointment was scheduled.  Defs.' LR 56.1(a)(3) Stmt. ¶ 28  Instead, Dr. Ghosh saw Quinn in the clinic the next day, October 22, 2010.  *Id.* At this appointment, Quinn's physical examination revealed nothing abnormal, with the one caveat that Quinn refused to undergo a sciatica nerve test.  *Id.* Two days later, on October 24, 2010, Dr. Ghosh saw Quinn again.  *Id.* ¶ 30.  Quinn complained of back pain and requested pain medication.  *Id.*  Dr. Ghosh found no tenderness upon conducting a physical examination, ordered a follow-up physical and a complete metabolic panel, and prescribed a muscle relaxant to help Quinn with his back pain.  *Id.*

Dr. Ghosh conducted a follow-up physical on October 29, 2010, at which time Quinn complained of left lower extremity pain from a twenty-four year old back injury.  *Id.* ¶ 31.  Dr. Ghosh's notes from this October 29, 2010, visit indicate that a prior EMG study and nerve

conduction velocity test were within normal limits, and a prior MRI had indicated degenerative disease at the L5-S1 level.  *Id.*  Dr. Ghosh prescribed Robaxin for pain.  *Id.*

A little less than a month later, on November 19, 2010, Dr. Ghosh saw Quinn again.  *Id.* ¶ 32.  Quinn was on a hunger strike at the time.  *Id.*  At the November 19, 2010 visit, Quinn complained of back pain, and Dr. Ghosh performed a complete physical examination, which revealed no tightness around the spinal muscle.  *Id.*  Dr. Ghosh ordered Quinn to continue medication.  *Id.*  Later that same day Quinn went to see La Tanya Williams.  *See* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 11; *see also id.*, Ex. I, (Williams' Medical Note). At this visit Quinn complained of various pain and ailments and stated that he had not received his shoes.  *See id.*

Dr. Ghosh saw Quinn again after the new year, on March 24, 2011.  *See* Defs.' LR 56.1(a)(3) Stmt. ¶ 34.  Dr. Ghosh performed a physical examination of Quinn and noted a history of low back pain, present since 1986.  *Id.*  Dr. Ghosh became concerned with possible herniation and ordered a new MRI.  *Id.*  Dr. Ghosh also switched Quinn from Motrin to Naprosyn for pain and prescribed a muscle relaxer, Flexeril, and a milk of magnesia for constipation.  *Id.*  At the March 24, 2011 appointment, the sole focus was Quinn's back; Dr. Ghosh does not remember Quinn raising any issue concerning inadequate or missing orthopedic shoes.  *See id.*  Quinn argues that the overall evidence shows he did have issues with shoes, and Dr. Ghosh knew this at the time.  *See* Pl.'s LR 56.1(b)(3)(B) ¶ 34.  Nevertheless, Dr. Ghosh reissued a medical permit for a low bunk, a low gallery, five showers per week, no stairs, orthopedic shoes, and the use of medical restraints (rather than handcuffing behind the back).  *See* Defs.' LR 56.1(a)(3) Stmt. ¶ 35.

### D. Wexford's Subsequent Actions

Wexford approved the MRI ordered by Dr. Ghosh, and the MRI was performed on May 10, 2011. *Id.* ¶ 36. The MRI revealed moderate bilateral neuroforminal stenosis, moderate degenerative joint disease, and degenerative changes in the lumbar spine, which were worse at L5-S1. *Id.*

Plaintiff was sent to Provena St. Joseph's Medical Center in May 2011, and there he was diagnosed with a strained back and shoulder. *Id.* ¶ 37. The treating physician at St. Joseph's, Dr. Kuo, noted that there was no clear etiology for Quinn's complaints of numbness. *Id.* A CT scan came back negative for acute changes or high grade stenosis, disc protrusion, herniation, stenosis, or neurological compromise. *Id.* ¶¶ 38–39. The CT scan did show degenerative joint disease. *Id.* ¶ 38. These results indicated that Quinn's chronic pain conditions may have been less than he perceived, but Dr. Ghosh admitted the proper orthopedic shoes may have helped Quinn's pain. *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 39.

### E. Wexford's Policies

Quinn also offers evidence concerning Wexford's review policies and its failure to abide by them. In particular, Wexford followed an internal governing document, the "Medical Policies and Procedures, Guidelines and Protocols," which contained a section entitled "Peer Review." *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 20-21. The goal of Wexford's "Peer Review" policy was to ensure the quality and integrity of patient care and provide a way to identify clinician strengths and weaknesses. *Id.* ¶ 21, 22.

According to its policy, Wexford conducted Peer Reviews at least on an annual basis. *Id.* Wexford performed "Peer Reviews" for a range of medical practitioners at its facilities — doctors, physician assistants, psychiatrists, and psychologists. *Id.* The "Peer Review" policies

lodged responsibility for overseeing the review system with the state regional medical directors. *Id.* The state regional medical directors also had responsibility for initiating corrective action plans for weaknesses identified by peer reviews and ensuring their effectiveness. *Id.*

In particular, Quinn asserts that Wexford staff conducted a peer review of Dr. Ghosh on March 5, 2009, formally written up by Wexford in April 2009. *Id.* ¶ 23. For the following two years, until Dr. Ghosh's retirement in 2011, Wexford conducted no other Peer Review of Dr. Ghosh. *Id.* The April 2009 peer review identified several areas of deficiencies in Dr. Ghosh's practice, including: poor documentation of patient care; inadequate screening of chronic care patients; and inadequate leadership and management of Stateville medical personnel. *Id.*

Despite the April 2009 review, Dr. Funk, who was Dr. Ghosh's supervisor and the state regional medical director, failed to prepare a separate report assessing Dr. Ghosh's peer review, as required by Wexford's policies. *Id.* ¶¶ 23–24. Dr. Funk also failed to create a corrective action plan to remedy the weaknesses identified by the April 2009 peer review. *Id.* ¶ 36. No one else at Wexford created such a plan. *Id.*

## II. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court gives "the non-moving party the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP,* 719 F.3d 785, 794 (7th Cir. 2013). In order to survive summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts[,]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986), and instead "must establish some genuine issue for trial such that a reasonable jury could

7

return a verdict in her favor." *Gordon v. FedEx Freight, Inc.,* 674 F.3d 769, 772–73 (7th Cir.2012). The Court will, however, "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statements." *Bordelon v. Chi. Sch. Reform Bd. of Trs.,* 233 F.3d 524, 529 (7th Cir. 2000).

### III. Analysis

#### A. A Genuine Dispute Exists Concerning Dr. Ghosh's Deliberate Indifference

Defendants first move for summary judgment on Quinn's claim that Dr. Ghosh acted with deliberate indifference to Quinn's medical needs in violation of the Eighth Amendment. The Eighth Amendment requires the government to provide medical care for those it is punishing by incarceration. *See Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009). "The Eighth Amendment safeguards the prisoner against a lack of medical care that may result in pain and suffering which no one suggests would serve any penological purpose." *Id.* (internal quotations omitted). "Accordingly, 'deliberate indifference to serious medical needs' of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Id.* (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

"The burden is on the prisoner to demonstrate that prison officials violated the Eighth Amendment, and that burden is a heavy one." *Pyles v. Fahim*, 771 F.3d 403, 408–09 (7th Cir. 2014). To establish a deliberate indifference claim under the Eighth Amendment, Quinn must prove: "(1) that the harm to [Quinn] was objectively, sufficiently serious and a substantial risk to his health or safety, and (2) that the individual defendants were deliberately indifferent to [Quinn's] health and safety." *Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553, 556 (7th Cir. 2003) (citing *Farmer v. Brennan,* 511 U.S. 825, 832 (1994)). The first element is objective, and to meet it "a prison official's act or omission must result in the denial of the minimal civilized

measure of life's necessities." *Farmer*, 511 U.S. at 834. Defendants do not meaningfully contest the first element.[3] Indeed, Quinn's maladies — severe back and foot pain — satisfy the first element. *See, e.g.*, *Pyles*, 771 F.3d at 411 ("[B]ack pain is an objectively serious medical condition."); *McSwain v. Schrubbe*, 382 F. App'x 500, 503 (7th Cir. 2010) (prisoner's painful "foot condition qualified as a serious medical condition[.]").

Defendants, instead, contest the second element. The second element is subjective, and to meet it "a prison official must have a 'sufficiently culpable state of mind.'" *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). "In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety." *Id.* And in the context of medical care, "deliberate indifference" means "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. But "a defendant's inadvertent error, negligence or even ordinary malpractice is insufficient to rise to the level of an Eighth Amendment constitutional violation." *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996). "In the context of medical professionals, this standard also has been described as the 'professional judgment' standard: A medical professional is entitled to deference in treatment decisions unless

---

[3] Defendants argue that evidence in the record shows Quinn to be malingering and potentially overstating the seriousness of his foot and back pain. *See* Defs.' Mem. Supp. 7; Defs.' Reply 10 (citing evidence that Quinn was observed exercising in his cell and may have been exaggerating his symptoms). Defendants argument, however, is undeveloped, and in any case, Quinn has submitted enough evidence of persistent complaints and medical visits to create, at a minimum, a genuine dispute as to the objective seriousness of his pain. Indeed, the Seventh Circuit holds that "[a] 'serious' medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)

9

'no minimally competent professional would have so responded under those circumstances.'" *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008) (quoting *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir. 1998)).

Defendants argue that Dr. Ghosh's repeated visits with Quinn and attentiveness to the efficacy of Quinn's pain prescriptions belie any claim that Dr. Ghosh acted with deliberate indifference. Quinn argues that his difficulty in scheduling appointments with Dr. Ghosh, Dr. Ghosh's awareness of Quinn's pain and suicide attempts, Dr. Ghosh's knowledge that Quinn had not yet received his orthopedic shoes, and Dr. Ghosh's subsequent failure to ensure Quinn received the orthopedic shoes all support his claim that Dr. Ghosh acted with deliberate indifference.

### 1. Difficulty in Scheduling Visits with Dr. Ghosh

First, Quinn argues that Dr. Ghosh's general inattention to Quinn constitutes deliberate indifference. *See* Pl.'s Mem. Opp'n 6. As an initial matter, the record does indicate that Dr. Ghosh periodically managed Quinn's pain. Dr. Ghosh may have not been proactive with Quinn, but there is no evidence establishing a genuine dispute that Dr. Ghosh's scheduling practices constitutionally harmed Quinn. Dr. Ghosh periodically saw Quinn and, during those visits, proscribed various pain-medications and scheduled various diagnostic procedures. There is evidence that Quinn desired different medication; at one point Quinn requested "stronger medications." *See* Defs.' LR 56.1(a)(3) Stmt. ¶ 19; Pl.'s LR. 56.1(b)(3)(B) Stmt. ¶ 19. But, generally, an inmate "is not entitled to demand specific care." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Moreover, it is undisputed that during the March 24, 2011, visit, Dr. Ghosh ceased providing Quinn with Motrin because it was not helping with Quinn's low back pain, and prescribed two different medications, Naprosyn and Flexeril. *See* Defs.' LR 56.1(a)(3) Stmt. ¶

34; Pl.'s LR. 56.1 (b)(3)(B) Stmt. ¶ 34. At this visit, Dr. Ghosh also examined Quinn's lower back and, concerned about herniation, ordered an MRI. *See id.*

That the visits Quinn was able to schedule with Dr. Ghosh were sporadic does not raise Dr. Ghosh's treatment of Quinn to the level of deliberate indifference. "A medical professional acting in his professional capacity may be held to have displayed deliberate indifference only if 'the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment.'" *Sain,* 512 F.3d at 895 (quoting *Collignon,* 163 F.3d at 988). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Pyles*, 771 F.3d at 409.

Likewise, Quinn's citation to *Greeno v. Daley*, 414 F.3d 645 (7th Cir. 2005), is unavailing. In *Greeno*, an inmate made repeated calls for a change in the course of treatment because his pain was worsening. 414 F.3d at 654. The doctors and nurses evinced an "obdurate refusal to alter Greeno's course of treatment despite his repeated reports that the medication was not working and his condition was getting worse." *Id.* The court noted that the refusal to alter treatment was "'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' his condition." *Id.* (quoting *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)). As the Seventh Circuit has noted, however, making a showing of "blatant inappropriateness" is "not easy." *Pyles*, 771 F.3d at 409. The most common factual pattern is where a prisoner's medical condition requires the attention of a specialist and the prison officials refuse to refer the prisoner to an appropriate specialist. *See id.* at 411–12. Here, Dr. Ghosh examined Quinn on numerous occasions and did refer Quinn to a specialist. Accordingly,

Plaintiff cannot rely upon Dr. Ghosh's failure to schedule regular visits or otherwise manage his pain to survive summary judgment, and summary judgment is appropriate as to this issue.

### 2. Dr. Ghosh's Knowledge of Quinn's Suicide Attempts

Quinn also argues that Dr. Ghosh acted with deliberate indifference because he was aware of Quinn's suicide attempts and "did nothing." In particular, Plaintiff objects that Dr. Ghosh did not check in on him to assure that he had not committed suicide. *See* Pl.'s Mem. Opp'n 6; *see also* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 29. "Suicide is a 'serious harm' and prison officials must take reasonable preventative steps when they are aware that there is a substantial risk that an inmate may attempt to take his own life." *Estate of Novack ex rel. Turbin v. Cnty. of Wood*, 226 F.3d 525, 529 (7th Cir. 2000). "Where the harm at issue is a suicide or attempted suicide, the second, subjective component of an Eighth Amendment claim requires a dual showing that the defendant: (1) subjectively knew the prisoner was at substantial risk of committing suicide and (2) intentionally disregarded the risk." *Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006). "With respect to the first showing, 'it is not enough that there was a danger of which a prison official should have been aware,' rather, 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Smith v. Alvarez*, 898 F. Supp. 2d 1057, 1064–65 (N.D. Ill. 2012) (quoting *Estate of Novack,* 226 F.3d at 529). "In other words, the defendant must be cognizant of the significant likelihood that an inmate may imminently seek to take his own life." *Id.* at 1065.

It is undisputed that Quinn attempted suicide. And it is undisputed that Dr. Ghosh was aware that Quinn was on suicide watch. *See* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 14. But Dr. Ghosh did not ignore the suicide risk, as Quinn contends. Dr. Ghosh performed a physical and

neurological examination of Quinn while he was on suicide watch. *See* Pl.'s LR 56.1(b)(3)(C) Stmt. Ex. B, Ghosh Dep., 63:20–64:13, Feb. 19, 2014. Although Dr. Ghosh testified he did not know exactly why Quinn missed an appointment that day, he did note that Quinn's appointment was rescheduled for a few days later. *See id.*, 62:3–7. And in any event, Quinn was on suicide watch at the time, and presumably being monitored by prison officials in a manner consistent with protocol for an inmate being placed on suicide watch. This is not a case where prison officials did not address an imminent risk of suicide by failing to place an inmate on suicide watch, *see, e.g.*, *Woodward v. Correctional Medical Services of Illinois, Inc.*, 368 F.3d 917, 925 (7th Cir. 2004), and Quinn identifies no evidence that Dr. Ghosh knew that the suicide watch over Quinn was deficient or faulty to the extent it would create an imminent risk of a subsequent attempt. As a result, Plaintiff's efforts to survive summary judgment based upon Dr. Ghosh's knowledge of his prior suicide attempts fail, and summary judgment is granted as to this issue.[4]

### 3. Dr. Ghosh's Knowledge that Quinn Had Not Received Orthopedic Shoes

Lastly, Quinn argues that Dr. Ghosh manifested deliberate indifference because he knew that Quinn still had not received his orthopedic shoes as of November 19, 2010, months after they had been prescribed, but did nothing about it. *See* Pl.'s Mem. Opp'n 6. In support, Quinn notes that he visited the prison infirmary twice on November 19 and, on the second of these visits, told La Tanya Williams that he had not received his orthopedic shoes. *See id.*; *see also* Pl.'s LR 56.1(b)(3)(C) Stmt., Ex. I. Williams then recorded Quinn's statement in her medical report. *See* Pl.'s LR 56.1(b)(3)(C) Stmt., Ex. I. Because Dr. Ghosh testified that he typically would review the medical reports of a prisoner who had visited the infirmary more than once in

---

[4] Nor does Dr. Ghosh's awareness of the suicide attempts alter the fact that Dr. Ghosh's general treatment of Quinn's foot and back pain passes constitutional muster — at another visit, three days later, Dr. Ghosh examined Quinn for these very ailments, ordered additional tests, and prescribed a muscle relaxant to address the pain. *See* Defs.' LR 56.1(a)(3) Stmt. ¶ 30; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 30.

one day, *see id.*, Ex. B, Ghosh Dep., 110:15–11:11; 12:6–8, Plaintiff contends that Dr. Ghosh must have known about the problem, but did nothing to remedy it.

During his deposition, Dr. Ghosh testified that he did not know that Quinn had not received the shoes. *See id.*, 98:24–99:22. But, he did acknowledge that he would ordinarily review the medical reports of a prisoner who visited the infirmary twice in one day because repeat visits would be deemed "emergencies." Dr. Ghosh then modified his testimony on redirect, testifying that it would not have been his practice to review medical records from an inmate's second visit to the infirmary subsequent to that inmate's first visit. *See id.*, 118: 15–21. In any event, Dr. Ghosh did not remember reviewing the medical report made by Williams of Plaintiff's visits. *See id.*, 116:16–18.

When the record is viewed in the light most favorable to Quinn, there is evidence from which a reasonable jury could conclude that Dr. Ghosh knew, as of November 19, 2010, that Quinn had not received his orthopedic shoes, months after they had been ordered. At the very least, there is a genuine dispute on this point. The question then becomes whether Dr. Ghosh's knowledge that Quinn had not received his orthopedic shoes nearly a year after they had been prescribed and his subsequent failure to follow up on the order create a genuine dispute of material fact for trial.

This is a close issue. There must be a genuine dispute that Dr. Ghosh had a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834. Put differently, there must be evidence establishing a genuine dispute that Dr. Ghosh knew of and disregarded "an excessive risk to inmate health or safety[.]" *Id.* at 837. "Negligence—even gross negligence—is insufficient to meet this standard, but the plaintiff is not required to show intentional harm." *King v. Kramer*,

680 F.3d 1013, 1018 (7th Cir. 2012). Instead, "[t]he standard is comparable to that required for criminal recklessness." *Id.*

On the one hand, Quinn has not offered any direct evidence that Dr. Ghosh intentionally failed to act after November 19. But deliberateness does not require a showing of intentionality. *See Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002). And "[d]elaying treatment may constitute deliberate indifference if such delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012) (citations omitted). As noted above, a reasonable jury could conclude that Dr. Ghosh reviewed the November 19 report and was aware of Quinn's persistent lack of orthopedic shoes. Furthermore, Dr. Ghosh himself testified that orthopedic shoes may have helped to alleviate Quinn's worsening pain. *See* Pl.'s LR 56.1(b)(3)(C) Stmt., Ex. B, Ghosh Dep., 96:5–19; 98:6–10. It further is undisputed that Dr. Ghosh did not take any action to ensure Quinn received the shoes after November 19. Quinn thus has marshalled evidence from which a reasonable jury could infer that Dr. Ghosh was deliberately indifferent to Quinn's requests for orthopedic shoes.

As a final matter, Defendants cite *Dunigan ex rel. Nyman v. Winnebago County*, 165 F.3d 587, 591 (7th Cir. 1999), for the proposition that an inmate's care must be evaluated in its totality when analyzing deliberate indifference claims. This is correct. But the mistreatment in *Dunigan* lasted for only three days, in contrast to the months at issue here. *See Reed v. McBride*, 178 F.3d 849, 855 (7th Cir. 1999) (discussing *Dunigan*). And unlike in *Dunigan*, Quinn has identified evidence that Dr. Ghosh knew Quinn had not received his orthopedic shoes almost a year after Dr. Ghosh had prescribed them and nearly five months after they had been ordered. Indeed, Dr. Ghosh took absolutely no action with respect to Quinn until March 24, 2011, when Quinn visited him and did not mention the need for the shoes. *See* Defs.' LR 56.1(a)(3) Stmt. ¶ 34. Because

there is evidence to show that Dr. Ghosh had knowledge of Quinn's lack of medical shoes and continued pain and did nothing to remedy the situation, Quinn has met his burden to show a disputed issue of material fact as to Dr. Ghosh's "inadequate response." *See Reed*, 178 F.3d at 855. Accordingly, Defendants' motion for summary judgment is denied to the extent Plaintiff's claim is based upon Dr. Ghosh's failure to remedy Plaintiff's lack of orthopedic shoes.

### B. Wexford's Failure to Abide by Its Own Policy

Defendants also move for summary judgment on Quinn's Eighth Amendment claim against Wexford. 42 U.S.C. § 1983 does not permit liability under the doctrine of *respondeat superior*. *Maniscalco v. Simon,* 712 F.3d 1139, 1145–46 (7th Cir. 2013). To proceed to trial against Wexford on his claim, Quinn must offer evidence creating a genuine issue of material fact that a policy, custom, or practice of Wexford was the "direct cause" or "moving force" behind the constitutional violation. *Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010).[5] "A plaintiff can establish an official policy through (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Teesdale v. City of Chic.*, 690 F.3d 829, 834 (7th Cir. 2012) (internal citations omitted). Quinn acknowledges he has identified no express policy. *See* Pl.'s Mem. Opp'n 7. And Quinn does not argue that a person with final policy-making authority caused the constitutional violation. Instead, Quinn contends that Wexford's widespread practice of failing to supervise its prison medical staff evinces an Eighth Amendment violation.

---

[5] This standard, which originally applied to municipal corporations, has been held to apply also to private corporations. *Minix*, 597 F.3d at 834 ("[A] corporation that contracted with the jail to provide medical services . . . is treated the same as a municipality for liability purposes under § 1983."); *see also Woodward*, 368 F.3d at 927 n.1.

16

Specifically, Quinn argues that Wexford knew the deficient manner in which Dr. Ghosh carried out his medical responsibilities at Stateville; issued a remedial order in an effort to address these deficiencies; but failed to comply with its own procedures, doing nothing to correct them. *See* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 24, 36. In support, Quinn offers evidence that an April 2009 review of Dr. Ghosh indicated a number of problems, including the failure to adequately document patient treatment and supervise staff. Pursuant to its own policies, Wexford ordered Dr. Ghosh's supervisor, Dr. Funk, to correct these deficiencies, but Dr. Funk did not carry out these instructions, and Wexford did nothing to ensure that this was done. *See id.* ¶¶ 22, 24, 36. What is more, Wexford failed to do another review of Dr. Ghosh for another two years, violating its own policies, at which point Dr. Ghosh retired. In essence, Quinn argues that this evidence creates a genuine dispute that Wexford's lack of oversight, in contravention of its own policies, was the moving force behind the Eighth Amendment violation Quinn allegedly suffered.

Defendants counter that Quinn has not brought forth evidence of the kind of "pattern" necessary for corporate liability. *See Cornfield by Lewis v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1326 (7th Cir. 1993). ("[A]n allegation of a pattern or a series of incidents of unconstitutional conduct is required."). In support, Defendants contend that Wexford's failure to conduct annual reviews is insufficient to establish liability here because Quinn has not identified any *other* prisoners who had failed to receive medical care.

It is certainly true that "isolated incidents do not add up to a pattern of behavior that would support an inference of a custom or policy, as required to find that Wexford as an institution/corporation was deliberately indifferent to [Quinn's] needs." *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 796 (7th Cir. 2014). But Quinn has introduced evidence that, for two years

17

in a row, Wexford conducted no annual review of Dr. Ghosh, as required under its own policies. *See* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 23. Moreover, the April 2009 peer review that was performed identified a number of areas in which Dr. Ghosh's performance was deficient, including: (1) the thoroughness of patient documentation; (2) the sufficiency and detail of clinical notes; (3) the adequacy of chronic care patient screening; (4) the frequency of collegial review; and (5) the effectiveness of Dr. Ghosh's oversight of the clinical staff and the Stateville medical staff. *See generally* Pl.'s LR 56.1(b)(3)(C) Stmt., Ex. O (April 2009 Peer Review of Dr. Ghosh). These deficiencies are precisely what led to the inadequate treatment at issue here.

Quinn notified Dr. Ghosh, as well as others under Dr. Ghosh's supervision, time and time again that he had not received the orthopedic shoes that had been prescribed for him many months before. Indeed, the record indicates that Quinn made at least thirteen separate requests for the shoes between November 17, 2008, and October 26, 2010. *See* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 28. Wexford's disregard for its annual review policy, *see id.* ¶ 22, and its repeated failure to address Dr. Ghosh's substandard performance, particularly in the areas of patient care documentation and supervision of the medical staff, made it "highly predictable" that Quinn's thirteen requests for the orthopedic shoes would never be acknowledged or heeded. *See Woodward*, 368 F.3d at 929 (noting that "evidence of a single violation of federal rights can trigger [defendant's] liability if the violation was a 'highly predictable consequence' of [defendant's] failure to act") (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 409 (1997)). Based upon this record, the Court finds that there is evidence from which a reasonable jury could find for Plaintiff with respect to his claim against Wexford, and summary judgment as to this issue is denied.

## IV. Conclusion

For the reasons provided herein, Defendants' motion for summary judgment [95] is granted in part and denied in part. Defendants' motion for summary judgment is granted to the extent that Plaintiff's claim is based upon Dr. Ghosh's failure to schedule regular appointments with him or Dr. Ghosh's knowledge of Plaintiff's prior suicide attempts. It is denied in all other respects.

**SO ORDERED**  ENTER: 3/10/15

**JOHN Z. LEE**
**United States District Judge**